Filed 7/24/15  P. v. Flores CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  The opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>JESSE FLORES,<br><br>    Defendant and Appellant. | G048772<br><br>(Super. Ct. No. M-9328)<br><br>O P I N I O N |

Appeal from an order of the Superior Court of Orange County, John L. Flynn, Judge.  Affirmed.

Ron Boyer, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Eric A. Swenson and Heather M. Clark, Deputy Attorneys General, for Plaintiff and Respondent.

\*          \*          \*

Jesse Flores was committed for an indeterminate term to the Department of State Hospitals (DSH; formerly the Department of Mental Health or DMH) after a jury determined he was a sexually violent predator (SVP) within the meaning of the Sexually Violent Predator Act (SVPA).  (Welf. & Inst. Code, § 6600 et seq.; all statutory citations are to this code unless otherwise noted.)  Flores raises evidentiary, instructional, and constitutional arguments seeking to reverse the commitment order.  We affirm.

I

FACTUAL AND PROCEDURAL BACKGROUND

In June 2001, the Orange County District Attorney petitioned to commit Jesse Flores under the SVPA.  In June 2011, the court found probable cause to believe Flores was likely to engage in sexually violent, predatory behavior if released (§ 6602) and set the matter for trial.  At trial in 2013, witness testimony detailed Flores's sexually violent offenses, psychologists Christopher Matosich and Dawn Starr testified about their respective SVP evaluations, the district attorney called Flores to testify as an adverse witness, and Flores presented expert and percipient witness testimony on his own behalf to demonstrate he was not an SVP.

A.  *Trial Testimony Concerning Prior Sex Offenses*

Cindy C. testified she and a friend, Yvonne, were walking to a friend's house in Downey on an evening in November 1976.  Both women were 18 years old.  Flores pulled up in his truck and persuaded them to accept a ride.  Once inside, he claimed he had to expose himself to 20 girls to get into a fraternity and had five more to go.  Yvonne managed to get out of the truck, but Flores grabbed Cindy by the throat and threatened to kill her unless Yvonne got back inside.  He took their driver licenses and told them he was memorizing their addresses and would kill them if they told anyone what happened.  He ordered both girls to remove their tops, threatened to kill them, and pulled his zipper down to expose his penis.  He made the girls kiss each other and suck the other's nipples.  He told Cindy to grab his erect penis.  Flores laughed when Cindy

2

pleaded with him not to rape her because she was a virgin. Cindy told him God would judge him harshly and asked Flores if he was familiar with a popular Christian counselor she identified. Flores's demeanor changed when she mentioned the counselor's name. He "looked like a ghost" and admitted he knew the counselor because he had helped Flores after he committed an act similar to his conduct with Cindy and Yvonne. Cindy told Flores he needed help and he should meet her at church on Sunday and they could pray with the counselor. Flores, who identified himself as Jesse Scott, admitted "there's something wrong with me."

Donna P. testified she returned to her Huntington Beach apartment after work in March 1978. She was 22 years old at the time. Flores, a stranger, was waiting in the carport. He approached Donna's car, and prevented her from leaving her car by grabbing her throat. He unbuttoned her blouse and touched her breasts. Donna asked him to explain why he wanted to rape her because she had never done anything to him. She argued there was no reason to rape her because he was a good looking man and could have a girlfriend. Flores replied he would not go through with his planned rape, but asked her to promise not to prosecute him. He demanded her driver's license and wrote down her information. She reported the attack, and Flores was convicted of assault with intent to commit rape. While the case was pending, Flores followed her after a court appearance. He and his parents offered Donna money and a car to drop the charges.

Mary M. testified she was a 22-year-old student attending a Huntington Beach community college on an evening in May 1978 when she felt ill and went into the restroom. Flores followed her into the restroom, turned off the lights, and grabbed her when she opened the stall door. He pushed her back into the stall, put his hand on her mouth, warned her he had a knife and ordered her to be quiet. He groped her chest and crotch and forced her to take her pants down. He unzipped his pants and tried to have intercourse with her. She said it was not going to work, and he replied "'well, make it work.'" She turned around and he penetrated her vagina from behind. He asked her if

3

she "had fantasies about this type of thing." He finished, pulled up his pants, and demanded money, and became angry when she told him she did not have any. He searched her purse and departed, telling her not to leave.

Laura C. testified she was 16 years old when Flores attempted to sexually assault her in Long Beach on an evening in November 1981. Flores ran up behind her, grabbed her in a choke hold, put his hand over her mouth, and threw her to the ground. She yelled "rape," and a man responded to chase Flores away.

Meredith E. testified Flores sexually assaulted her in April 1986 when she was 15 years old. She was watching television while babysitting the children of Flores's brother when Flores forced her to take her clothes off, put his finger in her vagina, raped her, and put his tongue or mouth on her vagina.

B. *SVP Evaluator Testimony*

Psychologist Christopher Matosich contracted with the DSH to perform independent SVP evaluations. He evaluated Flores in March 2012 and again in April 2013 using a standardized assessment protocol. The records Matosich reviewed contained the following: Flores suffered seven convictions for sexually violent criminal acts between 1975 and 1986 that qualified as SVP offenses. In September 1975, Flores approached two 13-year-old girls, Gale and Becky, displayed a knife, drove them to another location, and made them disrobe and fondle each other, guiding their hands. Flores took off his pants and inserted his fingers into Gale's vagina. Matosich noted the incident involving Cindy and Yvonne occurred while Flores was on probation and resulted in convictions for false imprisonment and commitment to Patton State Hospital (Patton) as a mentally disordered sex offender (MDSO).

Flores was released from Patton in November 1977. In March 1978, he assaulted Donna and in May 1978, Flores raped Mary. Flores received a five-year prison sentence for these offenses in August 1978 and obtained his release on parole in September 1981.

4

In April 1986, Flores forcibly orally copulated, sexually penetrated, and raped 15-year-old Meredith. He was convicted in November 1986 and in custody for these offenses at the time the SVP petition was filed.

In addition to these convictions, Matosich relied on other incidents in forming his opinions, including the 1975 sexual assaults on Gale and Becky, the November 1981 attempted rape incident involving Laura, which resulted in a parole violation and commitment to Atascadero State Hospital (Atascadero) in January 1982. Flores obtained his release from Atascadero in May 1982.

Additional records revealed in 1973, while stationed in Oklahoma with the military, Flores exposed himself to three eight-year-old girls. In December 1975, while masturbating in his car, Flores raised up his pelvis so a girl named Carol could see his penis and testicles. Flores followed Carol and her two female friends, and parked in front of them so they could observe him masturbate. In June 1976, Flores suffered a conviction for annoying or molesting a child and was placed on probation.

Matosich also noted records reflected Flores admitted he began exposing himself in school when he was 12 years old, and suffered his first arrest while in the military at age 19 or 20. He committed a store burglary in 1983 and failed to register as a sex offender on at least two occasions. His work history was infrequent and his longest period of employment ended when he was fired after six months for stealing.

Matosich testified Flores met the statutory criteria of a sexually violent predator. Matosich defined a SVP as a person suffering from a mental disorder that predisposes the person to commit sexually violent hands-on offenses against strangers or casual acquaintances. Matosich found that Flores met this definition, concluding that he currently suffered from several mental disorders, including paraphilia not otherwise specified (NOS), exhibitionism, voyeurism, and Axis II antisocial personality disorder characterized by aggression, irritability, impulsivity, and lack of empathy. Flores also

suffered from bipolar disorder, which in its manic phase might involve hypersexuality, but this affliction was currently in full remission because of medications and treatment.

Matosich explained most persons who rape do not have a paraphilia, but Flores's persistent preoccupation with deviant sexual behavior, fantasies, and urges despite incarceration and treatment supported the diagnosis. Matosich observed a "general rapist[], rape[s] for sex. It's focused, it's typically quick, and they move on. [¶] Individuals with paraphilia, specifically [] Flores, [had] a coercive type disorder. He's talking to the victim" and in one incident asked about her fantasies. He displayed "very specific attempts to personalize or continue the relationship" and to establish "future contact through a courtship-type of disorder process." He also had "a pattern of behavior of stalking or following" not seen with a general rapist. Matosich found significant that Flores's early onset of sexually deviant behavior had progressed to more diversified and serious "hands-on" sexually violent behavior over time.

Matosich concluded Flores's disorders were not curable and may have both a biological and environmental origin. Flores's mental disorders impaired his volitional control, predisposing him to commit criminal sexual acts that made him a menace to the health and safety of others. Matosich believed Flores would likely engage in sexually violent predatory behavior unless he received appropriate treatment while in custody.

Flores denied he had a sexual disorder when Matosich interviewed him, explaining at the time of each incident his life "was falling apart in some regard." He also claimed he had a very abusive mother and received a late diagnosis of bipolar disorder. Matosich viewed this as Flores's attempt to avoid personal responsibility and to portray himself as a victim, which suggested Flores would not voluntarily follow up with treatment for his disorders.

Matosich testified Flores did not respond to treatment during his hospitalization at Atascadero between 2001 and 2008, but records from his hospitalization at Coalinga State Hospital (Coalinga), which began in 2008, reflected he

6

actively participated in the treatment program over the previous two years and was making significant progress. Matosich noted Flores engaged in 12 aggressive incidents at Atascadero and one at Coalinga that demonstrated the severity and persistency of his antisocial personality disorder, but Flores displayed no verbal or physical aggression in the last 18 months, and there had been a decrease in his impulsivity. Flores had no sexually aggressive incidents since 1986.

Matosich performed the Static-99 sexual recidivism risk assessment. The Static-99 uses various factors related to the offender, his crimes, and his victims to determine the risk of committing another sexual offense. The assessment is regarded as a moderate predictor of sexual recidivism and may underestimate the actual risk. Based on Flores's score of eight and other relevant factors, including prior MDSO commitments, Matosich placed him in the high-risk and high-treatment category for sexual recidivism, measuring his risk at 4.96 times higher than the typical sexual offender. Matosich explained Flores had "intimacy deficits," meaning there was no indication he had ever been in a significant romantic relationship, which increased the risk of sexual recidivism. He also had a life-long pattern of disregarding the welfare of others. Research demonstrated "the presence of antisocial personality disorder with sexual deviancy increases the risk of sexual recidivism." Based on Flores's history, Matosich believed Flores would commit predatory sexual offenses again.

Although Flores's future plan included community-based treatment, Matosich did not believe Flores would follow through with treatment in an outpatient setting because he lacked sufficient volitional control to consistently participate in any program. Even in the controlled setting of a state hospital, Flores only recently had begun to accept treatment. Matosich also diagnosed Flores with malingering, which involves the faking or exaggerating certain symptoms to obtain an advantage, such as better housing.

7

Psychologist Dawn Starr also contracted with the DSH to perform independent SVP evaluations. She evaluated Flores initially in 2001 and interviewed him on five occasions, the last time in March 2013. She diagnosed Flores with paraphilia NOS and personality disorder NOS, which are mental disorders featuring volitional and emotional impairment. She also gave him a clinical diagnosis of voyeurism, exhibitionism, and noted he had been diagnosed with bipolar disorder and attention deficit disorder. Persons with his type of antisocial personality disorder tend to have a higher level of sexual interest and behaviors than others. Flores manifested other features of the disorder, including impulsiveness, irresponsibility, and a reckless disregard for the safety of others. He had an "inadequate" or "dependent" personality and had "not been able to function on his own very well when he" was "out in the community" and "had to rely on other people for subsistence . . . ."

Starr defined paraphilia NOS as "sexually arousing urges, fantasies, or behaviors" occurring over a period of at least six months toward "non-consenting sex or other kinds of deviant sexual interests that don't meet [] specified categories." Less than one percent of all rapists suffer from paraphilia NOS. Flores's history reflected he had "serious difficulty controlling his desire for non-consensual sex," and believed "the specific fact that the victims are not consenting is what arouses him." She noted Flores had made statements in the past acknowledging there was something wrong with him, but he could not control his misbehavior even though he knew what he was doing was wrong. Starr opined given "the totality of his history," Flores was "likely to commit future sexually violent predatory offenses without appropriate treatment in custody." Starr also found Flores scored an eight on the Static-99R, placing him in the high-risk category of offenders.

Starr stated Flores appeared to be making good progress in his treatment, he had better insight into his triggers and responses, and she was impressed with his release and relapse plan, which she described as comprehensive. She believed he would be ready

8

for release at some point in the future, but he had not had an opportunity to practice what he had learned outside a secure facility, and he occasionally reacted emotionally in ways that were "not consistent with good coping skills that in the past predisposed him to commit sexual offenses."

C.   *Flores's Testimony*

The government called Flores as an adverse witness during its case-in-chief (Evid. Code, § 776).  Flores described his prior sex offenses, both charged and uncharged, beginning at age 12 with exhibitionism.  He claimed to have forgotten significant details about several of the incidents, but accepted as true the facts recounted in the police reports.  He generally claimed the incidents occurred on the "spur of the moment," denied fantasizing about the sexual acts in advance, explaining he was "curious," interested in "the sexual aspect of it," and experienced "some arousal" during the assaults.  Flores stated he dated, had girlfriends, and had the ability to seek consensual sex, but acknowledged the nonconsensual aspects of the incidents did not detract from his sexual excitement.

Flores admitted he made profane and derogatory comments to staff and had physical altercations with other patients at Atascadero from 2001 to 2007 and initially during his commitment to Coalinga in 2008.  He also conceded he had been fired from previous jobs for theft and aggressive behavior, and had been terminated from several community college programs.  Flores recently had completed phase three of a five phase treatment plan, acknowledged it was "important to have a good relapse prevention plan," but claimed he did not need treatment in a secure facility like Coalinga anymore.  Flores denied ever having a sexual deviancy, explaining the rapes were "opportunistic" and he simply made several "bad choices."  Flores asserted he would not reoffend because he had learned how to emphathize with sexual assault victims.  But he previously claimed to have learned about his victims' feelings from his treatment, and nonetheless reoffended.

9

Flores testified the treatment he received at Coalinga was far more structured and "sex offender specific" than his treatment at Patton and Atascadero. He previously had provided false psychiatric symptoms to obtain safer housing in prison. He voluntarily participated in sex-offender treatment at Coalinga even though other patients made threats of bodily harm to prevent him from attending. He also attended and participated in other voluntary programs at Coalinga, including one where he comforted dying patients in the hospital wing. The remaining phases of his treatment program concerned preparation for release (phase four) and release (phase five) from commitment.

Flores presented the testimony of Dr. Allen Frances, a retired psychiatrist and chairperson of the task force that produced the fourth revision of the Diagnostic and Statistical Manual of Mental Disorders. Frances criticized Matosich and Starr for diagnosing Flores with paraphilia NOS, explaining "NOS diagnoses don't belong in courtrooms because they can't be trusted, they are unreliable."

Dr. Brian Abbott, a licensed psychologist and clinical social worker, evaluated Flores and concluded he did not meet the criteria of a SVP or a personality disorder NOS, and never suffered from a paraphilic disorder.

Several social workers, psychiatric technicians, other hospital workers, and a Jewish chaplain at Coalinga testified about Flores's progress in dealing with his mental disorders and the insight he demonstrated into the causes of his offenses. The witnesses also testified about his improvement in responding to treatment and described his cooperative and helpful demeanor while coping with the pressure of the hospital environment.

## II

### DISCUSSION

A.    *Substantial Evidence Flores Suffered from a Current Mental Disorder*

The SVPA provides for indefinite involuntary civil commitment of persons who meet specified criteria following the completion of their prison terms. (*People v.*

*McKee* (2010) 47 Cal.4th 1172, 1186-1187 (*McKee I*).) Section 6600, subdivision (a)(1), defines a sexually violent predator as "a person who has been convicted of a sexually violent offense against one or more victims and who has a diagnosed mental disorder that makes the person a danger to the health and safety of others in that it is likely that he or she will engage in sexually violent criminal behavior." To establish a person is an SVP, the government must prove the following: (1) the offender has been convicted of a qualifying sexually violent offense against at least two victims; (2) the offender has a diagnosed mental disorder; (3) the disorder makes it likely the offender would engage in sexually violent conduct if released; and (4) this sexually violent conduct will be predatory in nature. (*People v. Roberge* (2003) 29 Cal.4th 979, 984-985 (*Roberge*); *Cooley v. Superior Court* (2002) 29 Cal.4th 228, 243 & 246, fn. 9; *People v. Hurtado* (2002) 28 Cal.4th 1179, 1189.) The government must establish these elements beyond a reasonable doubt and the jury must unanimously agree before finding the defendant is a SVP. (*Reilly v. Superior Court* (2013) 57 Cal.4th 641, 648.)

"When considering a challenge to the sufficiency of the evidence . . . we review the entire record in the light most favorable to the judgment to determine whether it contains . . . evidence that is reasonable, credible, and of solid value – from which a reasonable trier of fact could find the defendant [qualified as an SVP] beyond a reasonable doubt." (*People v. Lindberg* (2008) 45 Cal.4th 1, 27; *People v. Fulcher* (2006) 136 Cal.App.4th 41, 52; see *Jackson v. Virginia* (1979) 443 U.S. 307, 318-319.) Reversal of the judgment is not warranted even though the evidence might support a contrary finding (*People v. Bolin* (1998) 18 Cal.4th 297, 331) and we may not reverse "'unless it appears "that upon no hypothesis whatever is there sufficient evidence to support"' the jury's verdict." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.)

Flores first contends insufficient evidence supported the jury's finding he had a diagnosed mental disorder. He asserts the deputy district attorney presented no "recent objective evidence" of a current mental disorder. Flores cites the absence of

evidence he engaged in sexually inappropriate behavior while in custody. For example, there was no evidence he made sexually inappropriate remarks, fantasized about his prior crimes, engaged in sexual misconduct, or stalked staff.

Flores relies on *People v. Buffington* (1999) 74 Cal.App.4th 1149 (*Buffington*), which rejected an SVP's claim he was denied equal protection of the law compared to other persons involuntarily committed (Pen. Code, § 2962 et seq. [Mentally Disordered Offenders]; § 5000 et seq. [Lanterman–Petris–Short (LPS) Act]). The SVP argued the "evidentiary requirements for determining who is suffering from a mental disorder and who is likely to reoffend . . . are lower than other civil commitment schemes," namely "the SVPA does not require 'any recent objective basis for a finding that an inmate is likely to reoffend.'" (*Id.* at p. 1159.) *Buffington* upheld the constitutionality of the SVPA in part by determining any equal protection requirement was satisfied by the administrative and judicial proceedings for screening and evaluation of SVP's, including professional assessments of the diagnoses and risk factors, which must satisfy the required criteria for SVP commitment beyond a reasonable doubt. (*Id.* at p. 1160.) *Buffington* concluded the provisions of the SVPA require "'recent objective indicia of the defendant's condition' and a 'recent objective basis for a finding that an inmate is likely to reoffend.'" (*Id.* at p. 1161.) Here, the testimony of Matosich and Starr established the recent objective indicia of Flores's condition and the likelihood he would reoffend. Nothing in *Buffington* or section 6600 requires evidence a person has acted out sexually in custody while awaiting trial per the SVPA.

Flores notes his most recent sexually violent act occurred 27 years before his SVP trial. He asserts that "courts have held that the evidence should at a minimum be from within the last one or two years." The cases he relies on are inapposite. In *Peters v. Superior Court* (2000) 79 Cal.App.4th 845, the issue was whether a petition to extend commitment under the former SVPA required a new petition supported by two current mental health evaluations. The court rejected the government's position the original

12

evaluations could "do double duty by supporting both the initial and recommitment petitions. . . . . There is no evidence that either of the authors of the 1996 reports has seen or examined Peters since 1996. Nor is there anything in the record to suggest that the authors of these reports intended that the reports be used in the recommitment process. Finally, the use of potentially stale reports subverts the manifest intent of the SVPA—the state must prove that the party suffers from a currently diagnosed mental disorder which predisposes him to engage in sexually violent criminal behavior." (*Id.* at p. 850.)

Flores's reliance on several cases is misplaced. In *People v. Munoz* (2005) 129 Cal.App.4th 421, the appellate court held the trial court erred by allowing evidence and argument concerning the defendant's two prior SVP commitments because this was irrelevant and tended to place the burden of proof on the defendant to prove he was no longer an SVP. (*Id.* at p. 432 ["it is necessary that nothing be done that suggests to the jury that its task is to compare the defendant's present mental status with an earlier finding that he or she is an SVP. As we have noted each SVP hearing addresses the defendant's current mental state. Nothing must be done to suggest the defendant is required to prove he is no longer an SVP or to effectively lessen the state's burden by establishing a datum of mental disorder and dangerousness"].)

In *Conservatorship of Hofferber* (1980) 28 Cal.3d 161, the court held the state could confine incompetent criminal defendants under the LPS statute if by reason of a mental disease, defect, or disorder the person represented a substantial danger of physical harm to others. The court reversed for several reasons, one of which was that "Even if [the defendant] had a dangerous mental condition in 1974 the passage of time by itself [the opinion was filed in 1980] diminishes the validity of an assumption that his dangerousness continues unabated." (*Id.* at p. 177 [court also noted the defendant "already had been confined in a hospital for the three-year treatment period [and] [p]sychiatric impressions gained during such a period of observation obviously are

13

relevant and important means of determining whether a person once violent remains so"].)

Nothing in these cases suggests recent sexual behavior is necessary to sustain an SVP finding. Here, as described above, psychologists Matosich and Starr considered Flores's conduct in the state hospital in concluding that Flores currently suffered from a mental disorder that qualified him as a SVP. Their testimony, as described in detail above, constitutes substantial evidence Flores currently suffered from a qualifying mental disorder. (See *Kansas v. Crane* (2001) 534 U.S. 407, 414-415, quoting Abel & Rouleau, Male Sex Offenders, in Handbook of Outpatient Treatment of Adults: Nonpsychotic Mental Disorders 271 (M. Thase, B. Edelstein, & M. Hersen eds. 1990) ["sex offenders' 'compulsive, repetitive, driven behavior . . . appears to fit the criteria of an emotional or psychiatric illness'"].)

Flores notes the psychologists testified paraphilias are chronic conditions characterized by current, intense, sexually arousing urges, fantasies or behaviors occurring over six months. Because he did not manifest these behaviors, Flores argues "the only reasonable conclusion is that [Flores] does not suffer from that condition." We are not persuaded. The argument does not take into account other possibilities. For example, the jury reasonably could conclude Flores kept his behaviors in check because of the close supervision and treatment he received while confined in the state hospital.

B. *Substantial Evidence Flores Likely to Reoffend*

Flores also argues there was insufficient evidence he would engage in predatory sexually violent conduct if released. (See *Roberge, supra,* 29 Cal.4th at p. 988 ["'likely [to] engage in sexually violent criminal behavior'" means the person "poses a substantial danger, that is, a serious and well-founded risk, of committing" such crimes if released from custody]; see also *Cooley, supra,* 29 Cal.4th at p. 256 [amenability to voluntary treatment is relevant to the ultimate determination whether the person is likely to engage in sexually violent predatory crimes if released from custody]; *People v.*

14

*Superior Court* (*Ghilotti)* (2002) 27 Cal.4th 888, 927.)  He challenges the reliability of the assessment tools Matosich and Starr used to support their opinions.  He cites Matosich's and Starr's testimony the Static-99R is a "'moderate predictor of sexual recidivism'" and argues "moderate accuracy is not one that meets the objective standard described by the term 'well-founded.'"

Penal Code section 290.04 requires SVP evaluators to use the Static-99 test, which is an actuarial instrument that allows an evaluator to place sexual offenders in different risk categories based on various factors such as age, marital status, the number of prior offenses, and the offender's relationship to the victims.  (*People v. Paniagua* (2012) 209 Cal.App.4th 499, 504, fn. 5.)  Matosich explained the Static-99 assessment has shown good to moderate reliability over time, but it underestimated the risk posed by a SVP.

Here both Matosich and Starr placed Flores in the high-risk and high treatment category.  Matosich concluded Flores's disorders were not curable, they impaired his volition, predisposed him to commit sexual acts that made him a menace to others, and he likely would "engage in sexually violent predatory behavior without appropriate treatment and custody."  Matosich noted Flores's antisocial personality disorder increased the risk he would reoffend, and Flores's failure to acknowledge he had a sexual disorder demonstrated a lack of personal responsibility and suggested Flores would not follow-up with postrelease treatment for his disorders.  Matosich also asserted Flores lacked the self-discipline to participate consistently in a treatment program, pointing out Flores did not respond to sex offender treatment at Atascadero between 2001 and 2008, and only recently had begun to accept treatment in the controlled setting of a state hospital.  Starr testified in a similar fashion.  Based on Flores's history, Starr concluded he was "likely to commit future sexually violent predatory offenses without appropriate treatment in custody."

Flores lacked a structured postrelease plan to keep him on track and deter any tendency to reoffend. Flores based his postrelease plans on a move to Oregon, but he admitted he knew no one there, did not have a job or residence waiting for him, and he had not been accepted into a sex offender treatment program. Based on Matosich's and Flores's testimony, the jury reasonably could conclude Flores lacked insight into his mental disorders and the motivation to treat them, which supported the conclusion Flores was likely to reoffend if given a chance.

In sum, Flores's repeated acts of predatory sexual violence since 1975, checked only while he was either incarcerated or in a state hospital, and expert testimony he was likely to reoffend, provided ample evidence to conclude Flores was likely to engage in predatory sexually violent behavior if released.

## C. *Statutory Standard of Dangerousness Not Void for Vagueness*

Flores asserts the SVPA is unconstitutionally vague because its standard of dangerousness, defined as whether the offender is "likely [to] engage in sexually violent criminal behavior," fails to conform to the notice requirements of the Fourteenth Amendment's due process clause. The California Supreme Court, however, has interpreted section 6601's phrase "*likely* to engage in acts of sexual violence" to mean "the person presents a *substantial danger*, that is, a *serious and well-founded risk*" of reoffending. (See *Ghilotti, supra,* 27 Cal.4th at p. 922; *Cooley, supra,* 29 Cal.4th at pp. 255-258; *Roberge, supra,* 29 Cal.4th at pp. 987-988.) He faults the Supreme Court's failure to adopt a "clear, quantitative delineation of the applicable legal standard," such as that used in some other states with similar SVP statutes. (See *Ghilotti, supra,* at p. 923, fn. 14 [citing other state standards including "'highly probable'" "'having a better chance of existing or occurring than not'" "'a substantial likelihood, at least more likely than not'" "'highly likely'"].) We reject Flores's claim the Supreme Court's articulation of the standard is constitutionally suspect. (*In re Marquez* (2003) 30 Cal.4th 14, 20 [courts required to interpret a statute consistent with applicable constitutional provisions seeking

16

to harmonize statute and constitution].)  The term "likely" has been approved in statutes that are substantially similar to the SVPA, such as the Kansas sex offender statute reviewed in *Kansas v. Hendricks* (1997) 521 U.S. 346.

D.    *Sua Sponte Duty to Instruct That "Likely" to Engage in Acts of Sexual Violence Meant "Much More Than the Mere Possibility" Flores Would Reoffend*

Flores asserts the trial court erred in failing to instruct the jury sua sponte that "likely" to engage in acts of sexual violence "connotes much more than the mere possibility that the person will reoffend."  (See *Ghilotti, supra,* 27 Cal.4th at p. 922.)

"'Even in the absence of a request, a trial court must instruct on general principles of law that are . . . necessary to the jury's understanding of the case.' [Citations.]  That obligation comes into play when a statutory term 'does not have a plain, unambiguous meaning,' has a 'particular and restricted meaning' [citation], or has a technical meaning peculiar to the law or an area of law [citation].  [¶] As is clear from our recent decision in *Ghilotti, supra,* 27 Cal.4th 888, the meaning of the SVPA's term 'likely' is neither plain nor unambiguous."  (*Roberge, supra,* 29 Cal.4th at p. 988.)

Here, the trial court instructed the jury that to find Flores was a SVP, there had to be a "substantial danger" and a "serious and well-founded risk" that he would reoffend if released.  This instruction closely tracked the language in *Roberge, supra,* 29 Cal.4th at page 988, where the court stated that "a person is 'likely [to] engage in sexually violent criminal behavior' if at trial the person is found to present a *substantial danger,* that is, a *serious and well-founded risk,* of committing such crimes if released from custody."  No reasonable juror would have read the trial court's instruction to conclude a "mere possibility" of reoffending would suffice to qualify Flores as an SVP. The instruction was accurate as given, although in the future the better practice would be to instruct the jury with the language Flores complains was improperly omitted to track precisely the definition of "likely" articulated in *Ghilotti, Cooley,* and *Roberge.*

17

E.    *Sua Sponte Duty to Instruct on Amenability to Treatment*

Relying on *People v. Grassini* (2003) 113 Cal.App.4th 765 (*Grassini*), Flores contends the trial court had a sua sponte duty to instruct the jury it should consider whether his amenability to treatment raised a reasonable doubt as to whether he was likely to reoffend.  We disagree.

In determining whether it is likely the person will reoffend, the jury must consider whether the individual presents a serious and well-founded risk of committing a sexually violent predatory crime if released from custody.  (*Roberge, supra,* 29 Cal.4th at pp. 988-989.)  Evidence of the person's amenability to voluntary treatment is relevant to the ultimate determination whether the person is likely to reoffend.  (*Id.* at p. 988, fn. 2.)  Evidence that a person is amenable to voluntary treatment creates a sua sponte duty "to instruct the jury that it is to determine whether custody in a secure facility is necessary to ensure that the individual is not a danger to the health and safety of others."  (*Grassini, supra,* 113 Cal.App.4th at p. 777)  "Based upon the holding in *Grassini*, CALCRIM No. 3454 includes as a fourth element that must be proved to establish SVP status if there is evidence of the individual's amenability to voluntary treatment, that it is necessary to keep the person 'in custody in a secure facility' to ensure the public health and safety."  (*People v. Superior Court (George)* (2008) 164 Cal.App.4th 183, 194-195.)

Here, the trial court instructed the jury it must determine whether:  "[I]t is necessary to keep [Flores] in custody in a secure facility to ensure the health and safety of others."  Flores acknowledges this language "parallels words in *People v. Grassini*," but asserts the words used "completely fail to address the issue that triggers the instruction" because "it did not ask the jury to address whether [his] amenability to voluntary treatment raised a reasonable doubt as to whether [he] was likely to reoffend."  Because the instruction was a correct statement of the law, the trial court did not have a sua sponte duty to further instruct the jury on this point.  Flores could have asked for a special instruction on this point, but he failed to so.

18

F.    *Instructions Concerning Burden of Proof of Dangerousness*

Flores argues the trial court placed the burden of proof regarding dangerousness on him. He explains, "The jury was asked to determine whether 'it is necessary to keep him in custody in a secure facility to ensure the health and safety of others.' Even though this instruction speaks in terms of what the petitioner must prove, the element as stated inherently reverses the burden of proof. [¶] . . . [¶] . . . As the question is framed, if the jury has no evidence of anything that would guarantee the health and safety of others then the jury has no choice but to answer that confinement in a secure facility is necessary. In that sense, on this element, the burden of proof has been reversed. [¶] To ask the jury to determine whether confinement is necessary to ensure the health and safety of others effectively places a burden on the individual in that the jurors must find the element met unless the health and safety of others has been otherwise ensured."

Flores's argument does not persuade us the instruction was flawed. We disagree. The court instructed the jury the *petitioner* "must prove beyond a reasonable doubt that" it was "necessary to keep [Flores] in custody at a secure facility to ensure the health and safety of others." No reasonable juror would interpret this instruction to place the burden on Flores to prove his confinement was unnecessary. The district attorney's argument did not shift the burden of proof either. He argued that while Flores was "making this progress, which is good, . . . he needs to demonstrate more improvement in treatment, more consistent progress in that type of secure setting." He also argued, "[Appellant] has not demonstrated or established the type of consistent improvement and progress, and in treatment without incident that is necessary to determine that he will be able to complete some type of outpatient treatment program successfully." Contrary to Flores's view, this argument did not shift the burden to Flores to prove he would successfully complete treatment in the community or that it was necessary to keep him in a secure facility in contradiction to the jury instructions. The deputy district attorney

19

merely noted Flores's lack of progress in his previous treatment, which leads to an inference that he was unlikely to follow or benefit from treatment if released from custody.

G.    *Pinpoint Instruction Concerning Absence of Recent Overt Act*

Flores requested the following pinpoint instruction: "While 'Danger to the health and safety of others' does not require proof of a recent overt act while the defendant is in custody, this does not mean that absence of such conduct may not be considered by you in reaching a verdict in this matter." The court denied the request: "[I]t is more of a case of argument. I think it is not an appropriate jury instruction."

SVP trials are special proceedings of a civil nature. (*Moore v. Superior Court* (2010) 50 Cal.4th 802, 815, 821.) In both civil and criminal cases any party may ask the trial court to give the jury special instructions concerning points of law. (Code Civ. Proc., § 609; Pen. Code, §§ 1093, subd. (f), 1127; *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1192 (*Rodrigues* ) [amplifications or clarifications of law]; *People v. Bolden* (2002) 29 Cal.4th 515, 558 (*Bolden* ) [instructions pinpointing the theory of the defense case].) A trial court may refuse any proffered instruction if it incorrectly states the law, is argumentative, or merely duplicates other instructions. (*Bolden, supra,* at p. 558; *People v. Gurule* (2002) 28 Cal.4th 557, 659; *Ideal Heating Corp. v. Royal Indem. Co.* (1951) 107 Cal.App.2d 662, 668.)

As noted, a sexually violent predator is a person who has a "diagnosed mental disorder that makes the person a danger to the health and safety of others . . . ." (§ 6600, subd. (a)(1).) Section 6600, subdivision (d), provides, "'Danger to the health and safety of others' does not require proof of a recent overt act while the offender is in custody."

The trial court instructed the jury with CALCRIM No. 3454: "In order to prove that . . . Flores is a danger to the health and safety of others, the People do not need to prove a recent overt act committed while he was in custody. A recent overt act is a

20

criminal act that shows a likelihood that the actor may engage in sexually violent predatory criminal behavior." The instruction tracked the statutory language and was sufficient to apprise the jury of the elements needed to determine whether Flores qualified as an SVP. (*People v. Williams* (2003) 31 Cal.4th 757, 774-775 [CALCRIM No. 3454 tracks statutory language and is sufficient].) The proposed pinpoint instruction was argumentative because it unduly emphasized a particular issue, the absence of a recent overt act, and invaded the jury's province by inviting the jury to draw inferences favorable to Flores. Such an instruction is improper. (*People v. Mincey* (1992) 2 Cal.4th 408, 437 [court must refuse argumentative instruction that invited jury to draw favorable inferences to one party from specified evidence].)

Flores argues the court had a duty to provide his pinpoint instruction to counter the deputy district attorney's closing argument the government did not have to prove recent sexual misconduct. The district attorney argued: "So, exposing himself to individuals at the hospital or prison, in terms of proving that he is a danger, I don't need to show that. Okay. Peering through windows, don't need to show it. Raping individuals in the facility, don't need to show it. Committing sexual acts on staff, females in the facility, other patients, in terms of proving he's a danger, that does not have to be shown." The deputy district attorney's argument merely illustrated how to apply CALCRIM No. 3454 and therefore furnishes no support for Flores's argumentative instruction. Nothing prevented Flores from pointing out to the jury they may consider that Flores had not committed a recent overt act when deciding whether he posed a danger to others.

Finally, assuming for the sake of argument the court erred by declining to provide the requested instruction, the error was harmless. (*People v. Larsen* (2012) 205 Cal.App.4th 810, 930 ["Erroneous failure to give a pinpoint instruction is reviewed for prejudice under the *Watson* harmless error standard"]; *People v. Ervin* (2000) 22 Ca1.4th 48, 91.) The substance of the refused instruction was conveyed through the

21

instructions that were given; no essential element of, or defense to, an SVP finding was removed from the jury's consideration, and the jury was not misled; counsel conveyed the substance of the refused instructions in their arguments. Based on the evidence, it is not reasonably probable defendant would have obtained a more favorable result had either or both of the requested instructions been given. (See *People v. Kraft* (2000) 23 Cal.4th 978, 1066; *People v. Tapia* (1994) 25 Cal.App.4th 984, 1028.)

H.  *Pinpoint Instruction Concerning Prosecutor's Burden to Prove Flores's Mental Illness Was Sufficient to Distinguish Him From a Typical Recidivist*

Flores requested the following instruction:  "You may not find the petition true unless the prosecutor proves beyond a reasonable doubt that Mr. Flores suffers from a diagnosable mental disorder that predisposes him to commit sexually violent crimes if released.  The prosecutor must prove beyond a reasonable doubt that the mental illness is sufficient to distinguish Mr. Flores from a dangerous, but typical recidivist in an ordinary case."  Counsel explained, "the jury heard evidence about antisocial personality disorder and it causes general criminality.  I think it is important to distinguish that it is not just general criminality.  The statute is not concerned about if he goes down and steals from Target.  The statute is concerned about hands-on [sexual] offending.  I think that's an important distinction.  I don't think that's made in 3454."  The court disagreed, stating it was "adequately covered by [CALCRIM No.] 3454."

In *Kansas v. Crane, supra,* 534 U.S. 407, the Supreme Court noted the federal Constitution requires a distinction to be drawn between a dangerous sexual offender subject to civil commitment and other criminals dealt with in criminal proceedings.  To warrant civil commitment, the person must manifest "a special and serious lack of ability to control behavior."  (*Id.* at pp. 412-413.)  The court noted "'inability to control behavior' will not be demonstrable with mathematical precision.  It is enough to say that there must be proof of serious difficulty in controlling behavior.  And this, when viewed in light of such features of the case as the nature of the psychiatric

diagnosis, and the severity of the mental abnormality itself, must be sufficient to distinguish the dangerous sexual offender whose serious mental illness, abnormality, or disorder subjects him to civil commitment from the dangerous but typical recidivist convicted in an ordinary criminal case." (*Id.* at p. 413; see *Foucha v. Louisiana* (1992) 504 U.S. 71, 82-83 [rejecting civil commitment permitting indefinite confinement of typical convicted criminal after completion of a prison term].)

Nothing in *Crane* suggests the jury must receive an instruction requiring it to distinguish a dangerous sexual offender from a typical recidivist. Here, the court instructed (CALCRIM No. 3454) the jury it must find Flores had a diagnosed mental disorder and as a result of that disorder he was a danger to the health and safety of others because it was likely he would engage in sexually violent predatory criminal behavior, and it was necessary to keep him in custody in a secure facility to ensure the health and safety of others. The court also advised the jury the term "diagnosed mental disorder" included conditions that affected "a person's ability to control emotions and behavior, and predispos[ed] that person to commit criminal sexual acts to an extent that [made] him or her a menace to the health and safety of others. [¶] A person is likely to engage in sexually violent predatory behavior if there is a substantial danger, that is, a serious and well-founded risk that the person will engage in such conduct if released into the community." These instructions informed the jury they could not find Flores was a SVP unless they found he was a "menace" and posed a substantial danger of committing sexually predatory acts because he had a serious difficulty in controlling behavior due to a diagnosed mental disorder. (See *Williams, supra,* 31 Cal.4th at pp. 774-775 [the SVPA "inherently *embraces and conveys* the need for a dangerous mental condition characterized by impairment of behavioral control," and "a jury instructed in the language of [the SVPA] must necessarily understand the need for serious difficulty in controlling behavior;" no "further lack-of-control instructions or findings are necessary to support a commitment under the SVPA."].) Nothing in the testimony of Matosich,

23

recounted above, or the prosecution's argument, suggests a need for additional instruction.

I.  *Victim Impact Evidence*

Flores complains the court abused its discretion by allowing the district attorney to ask Flores's victims how the crimes had affected their lives. For example, Laura C. testified, "I have trust issues with men. I lost a lot of relationships because of this. I don't have the desire to have sex." Cindy C. testified, "This is the first time that I had ever seen a man erect, a penis like that, and it affected me. I was scared to tell my father. . . . It made me afraid of men a little bit." Donna P. testified, "[I]t made me a nervous wreck. It made me scared. I never really started putting it behind me until I heard he was put in prison. And then, I started relaxing about it and forgetting about it." Mary M. testified, "In general, I was extremely traumatized. . . . I had just a lot of trouble with just the normal things for quite a while. I didn't, for ten years, go into a public restroom. I just – I had for the next year, I had nervousness, these muscle spasms. I don't know how to explain it." And she testified, "I ended up taking a medical leave from school the next year for a semester. I did get back and I did complete my schooling. So, it had quite an impact, very just traumatized is all I can say." Meredith E. testified, "It messed up my life a lot. I couldn't trust guys. I still have a problem with it. I was a virgin when it happened, so I didn't want to be with anybody at all after that."

Flores objected the testimony was irrelevant and subject to exclusion under Evidence Code section 352. The trial court overruled Flores's objection, explaining "the continuing impact and damage, mental and/or physical, that results from certain types of conduct do fall within element three, may be a danger to the health and safety of others."

We agree with Flores the victim impact evidence, recounted above, lacked probative value on the issue of whether he was currently a danger to the health and safety of others because he was likely to engage in sexually violent criminal behavior in the future. As noted by Flores, "If the district attorney has proved that the respondent has a

24

mental disorder that makes him or her likely to commit sexually violent predatory offenses, the law does not set the district attorney the further task of proving that the commission of sexually violent predatory offenses is a danger to the health and safety of others." In other words, predatory sexual criminal behavior is intrinsically harmful and evidence Flores's prior victims did or did not suffer harmful effects from his conduct did not assist in proving a material fact in issue. Further, any probative value was substantially outweighed by the probability its admission would create a substantial danger of undue prejudice, confusing the issues, or misleading the jury. (*People v. Carter* (2005) 36 Cal.4th 1114, 1168 [evidence is prejudicial under Evidence Code, section 352 if it "tends to evoke an emotional bias against a party, while having only slight probative value with regard to the issues"]; *People v. Scott* (2011) 52 Cal.4th 452, 491 ["[E]vidence should be excluded as unduly prejudicial when it is of such nature as to inflame the emotions of the jury, motivating them to use the information, not to logically evaluate the point upon which it is relevant, but to reward or punish one side because of the jurors' emotional reaction. In such a circumstance, the evidence is unduly prejudicial because of the substantial likelihood the jury will use it for an illegitimate purpose"].) Although the trial court has broad discretion in determining the relevance of evidence (*People v. Riggs* (2008) 44 Cal.4th 248, 289; *Rodrigues, supra,* 8 Cal.4th at pp. 1124-1125 [Evid. Code, § 352]), the court erred in this instance.

The erroneous admission or exclusion of evidence does not require reversal unless it results in a miscarriage of justice, however. (*People v. Richardson* (2008) 43 Cal.4th 959, 1001 (*Richardson*); Evid. Code, §§ 353, subd. (b); 354.) A miscarriage of justice occurs when it is reasonably probable a result more favorable to the appealing party would have been reached absent the error. (*Richardson, supra,* at p. 1001; *People v. Partida* (2005) 37 Cal.4th 428, 439 [admission of evidence erroneous under state law does not offend due process requiring review under the harmless beyond-a-reasonable-doubt standard unless it renders the trial fundamentally unfair]; *Watson, supra,* 46 Cal.2d

at p. 836.)  Here, the victims' testimony on the impact Flores's crimes had on their lives consisted of less than one page each in the trial transcript.  The testimony was no more likely to evoke an emotional response than testimony regarding the actual details of the prior crimes, which was properly admitted.  The trial focused mainly on expert testimony addressing Flores's risk of reoffending.  Thus, it is not reasonably probable that a result more favorable to Flores would have been reached absent the error.

J.    *Cumulative Error*

Flores argues multiple errors combined to violate his due process right to a fair trial.  (*People v. Hill* (1998) 17 Cal.4th 800, 844-845 [multiple trial errors independently harmless may in combination create reversible error].)  As explained above, we have found only one error, and that error was not prejudicial.  The cumulative error doctrine does not apply.

K.    *Equal Protection*

Flores contends SVP's are situated similarly to persons committed as MDO's (Pen. Code, § 2960 et seq.) and those found not guilty by reason of insanity (NGI's) (Pen. Code, § 1026.5, subd. (a)), but are treated differently in that MDO's and NGI's may be held for only limited periods unless the State proves beyond a reasonable doubt they remain mentally disordered and dangerous, while SVP's (since the enactment of Proposition 83 in 2006) may be held indefinitely unless, by a preponderance of the evidence, they prove themselves no longer mentally ill and dangerous.

*People v. McKee* (2012) 207 Cal.App.4th 1325 (*McKee II*), following remand from the Supreme Court in *McKee I,* held the state demonstrated a constitutional justification under a strict scrutiny and compelling interest standard for imposing on SVP's a greater burden to obtain release from commitment than on those persons committed as MDO's and NGI's.  *McKee II* concluded the government "presented substantial evidence to support a reasonable inference or perception that the Act's disparate treatment of SVP's is necessary to further compelling state interests" (*id.* at

p. 1339), namely that SVP's present a substantially greater danger to society than MDO's or NGI's, and disparate treatment is necessary to further the People's compelling interests of public safety and humane treatment of the mentally disordered.

The California Supreme Court denied review in *McKee II*. Every published opinion to consider the issue has found *McKee II* persuasive and concluded the SVPA passes constitutional muster under the strict scrutiny test. (*People v. Gray* (2014) 229 Cal.App.4th 285; *People v. Kisling* (2014) 223 Cal.App.4th 544, 547-548 [declining to follow *McKee II* would be contrary to the California Supreme Court's clear intent in remanding *McKee I* to the trial court for an evidentiary hearing]; *People v. McDonald* (2013) 214 Cal.App.4th 1367, 1378-1383 [per *McKee I* equal protection challenge was to be resolved on a classwide basis rather than affording each potential SVP the right to present his or her own evidence on the matter, *McKee II* conducted the required de novo review, applied a true strict scrutiny standard, and correctly assessed the evidence]; *People v. Landau* (2013) 214 Cal.App.4th 1, 44-45; *People v. McCloud* (2013) 213 Cal.App.4th 1076, 1078-1079, 1085-1086; *People v. McKnight* (2012) 212 Cal.App.4th 860, 862-864.) Although we are not bound to follow *McKee II* (see 9 Witkin, Cal. Procedure (5th ed. 2008) Appeal, § 498, p. 558 [noting tendency for a Court of Appeal to follow decisions from other districts or divisions]), we do so here and reject Flores's claim his federal and state equal protection rights were violated by the version of the SVPA applied to him. We decline his request to remand to the trial court for an evidentiary hearing.

## III

### DISPOSITION

The order of commitment is affirmed.


ARONSON, J.

WE CONCUR:


RYLAARSDAM, ACTING P. J.


THOMPSON, J.